UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

LUIS VELAZQUEZ,

                         Petitioner,

        -vs-                              **No. 6:14-CV-06265(MAT)**
                                         **DECISION AND ORDER**
DALE ARTUS,

                         Respondent.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## I.   Introduction

Proceeding <u>pro se</u>, Luis Velazquez ("Velazquez"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is being unconstitutionally detained in Respondent's custody. Petitioner is incarcerated pursuant to a judgment, entered on June 8, 2007, in Monroe County Court (Keenan, J.) of New York State, following a jury verdict convicting him of Murder in the Second Degree (N.Y. Penal Law ("P.L.") § 125.25(1)), Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03(2)), and two counts of Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02(1), former (4)).

## II.  Factual Background and Procedural History

On August 11, 2006, Petitioner indicted by a Monroe County grand jury on two counts of murder in the second degree (intentional and felony murder), one count of criminal possession of a weapon in the second degree, and two counts of criminal possession of a weapon in the third degree. The indictment alleged

that, on June 27, 2006, Petitioner, either alone or with others, in the course of a robbery or attempted robbery, intentionally caused the death of Noel Olmeda Ortiz ("Ortiz") by shooting him with a firearm.

At Petitioner's trial, the prosecution called Ortiz's common-law wife, Linda Torres ("Torres"), who testified that she lived at 115 Murray Street, in apartment #2, with Ortiz and her two children. Torres estimated that she had known Petitioner for about 8 months, having met him at church when they first arrived in the United States from Puerto Rico. At some point, Torres and Petitioner had argued over some work had failed to perform on her car. Although Petitioner and his wife had made up with Torres, she nevertheless stopped attending church. Ortiz, however, continued to attend church and socialize with Petitioner.

On June 27, 2006, at about 1:30 p.m., Ortiz came home and ate lunch, after which the whole family laid down to take naps. At about 2:38 p.m., Ortiz received a call on his cell phone. Torres heard him walk to the back of the apartment, open the door, and close the door. She then heard yelling and the sounds of pushing, scuffling, and fighting, so loud that the walls "tremble[d] like if the house was fighting with something." T.255.[1]

Upon hearing several gunshots, Torres got out of bed and ran

---

[1]

Citations to "T." refer to pages from the transcript of Petitioner's trial, submitted by Respondent in connection with his response to the petition.

to the back stairway. She opened the door and looked down from the top of the stairs and saw Petitioner, wearing a white t-shirt and blue pants, holding a pistol and standing over Ortiz, who was lying on the floor, bleeding. T.255-56. Petitioner looked up at Torres, who yelled at him, demanding to know what he had done and stating she was going to call the police. Petitioner pointed the gun at Torres but said nothing. At that point, Torres' children were standing behind her. Petitioner grabbed a black bag that was lying on the second step from the bottom of the stairs and the keys to Torres's car. Petitioner then  left the apartment through the back door.

From a window in the back hallway, Torres watched as Petitioner unlocked the door to her van. Just then, a black van with tinted windows backed into the driveway towards their garage. Petitioner jumped into the van on the passenger side, and the van drove away. Torres ran out to the street, screaming for help.

Meanwhile, a neighbor, Della Smith ("Smith"), was sitting on her porch at 83 Masseth Street when she heard two "pops" and "then three more[.]" T.241. When Smith looked to the corner of Murray and Masseth Streets, she saw "a car facing out from that [i.e., Torres's] driveway, and a guy came running out of the back of the building and around the front of that vehicle into the passenger's side[.]" T.242. Smith could not see the face of the man who was running, but he appeared to be "a light-skinned black or a Spanish

person" in his twenties, about 5'4" or 5'5" tall and 180 pounds, and wearing baggy pants, an oversized white T-shirt, and a backwards baseball cap. He was holding one hand close to his side. T.243-44.[2]

When Torres ran outside into the street, she encountered her neighbor Eileen Gates ("Gates"). Gates was unable to understand Torres, who was speaking rapidly in Spanish. Gates and another neighbor went over to Torres's apartment at 115 Murray Street to try to find out what was happening. There Gates found Ortiz "sitting on his legs in a fetal position[.]" T.234. Gates asked him his name but got no response, although she did feel a pulse. While she was speaking on the phone with the 911 operator, Gates ceased to detect any pulse.

Officers Glaze and Hinman of the Rochester Police Department arrived on the scene where several neighbors directed them to apartment #2 at 118 Murray Street. There they found Ortiz being tended to by Gates. Officer Hinman saw one spent shell casing on the stairs and two on the floor near Ortiz.

During their investigation of the crime scene, the police found a wrapped-up, brick-shaped package underneath Ortiz's body, which contained 2.18 pounds, or approximately one kilogram, of

---

[2]
At the time, Petitioner was 29-years-old, 5'6" tall, and weighed 170 pounds. T.438-39.

cocaine.[3] At the top of the stairwell, "directly above where the subject was found," the police found a plastic bag which contained $5,320 in cash and "dummied up large rolls of money[.]" T.341-43, 415, 473. Newspaper had been cut into the shape of bills and rolled into the interior of the money bundles to make it appear as though the bag contained $20,000 to $40,000 in cash. The police also recovered five spent .40-caliber casings and four projectiles.

During the autopsy of Ortiz, the coroner found five gunshot wounds but could not determine the order in which the bullets had been fired. One shot ("Bullet A") had entered and exited the left cheek, then passed into the left chest just below the collar bone, tearing a hole in the aortic arch before exiting through the right mid-back. T.504-05. Stippling on Ortiz's forehead, around the eye, indicated "a close range of fire, perhaps up to a couple of feet away." T.508-10. According to the coroner, this bullet caused lethal injuries. Bullet B, which had inflicted non-lethal injuries, had been fired at a slightly further distance than Bullet A. It entered through Ortiz's left ear, traveled into his upper neck, and exited his upper back.  Bullet C had entered "just to the left of midline on the chest[,] . . . fairly low down on the chest[.]" T.520. That shot had penetrated the liver, and had exited the lower

---

[3] Torres testified that she did not know how the cocaine came to be located in the back stairwell of their apartment or why there was over $5,300 in cash in the vicinity of her deceased common-law husband's body. Torres denied that Ortiz was involved in trafficking drugs to and from Puerto Rico, claiming that he sold cars for a living. Torres was on welfare, but both she and Ortiz owned Rolex watches.

back. The large abrasion mark around the entrance wound from Bullet C indicated that it had been inflicted at close range and was, "in fact, . . . a contact wound[.]" T.521-22; 461. Bullet D paralleled Bullet C's trajectory and exited close to Ortiz's kidneys. Bullets C and D were fatal since they both lacerated the liver, causing internal bleeding. Bullet E entered "the palm side of the left forearm," shattered "the bones of the forearm right where they join the elbow," and then exited from the elbow. Toxicology testing revealed the presence of cocaine in Ortiz's system. There was no doubt, however, that the cause of death was multiple gunshot wounds.

The county firearms examiner determined that the five shell casings all were .40-caliber. Three of the casings had been fired from one .40-caliber semi-automatic pistol, while two of the casings both had been fired from a different pistol (either a .40-caliber or 10 millimeter handgun). Two of the four .40-caliber projectiles recovered at the scene had been fired from the same Smith & Wesson .40-caliber handgun, or the same 10 millimeter handgun. T.455. The remaining two projectiles were "fired .40 caliber class bullet[s]" that had been fired from a different gun than the first two projectiles. However, the firearms examiner "could not determine if they [the latter two projectiles] were fired from the same gun, although they had the same rifling characteristics present[.]" T.456-57. Without being able to examine

the firearms themselves, the firearms examiner could not determine whether the projectiles had been fired from the same guns that had discharged the casings. The bullet hole in the gray sweater worn by Ortiz at the time of his death was consistent with the type of hole created by a close contact gunshot. T.460-61.

Petitioner was apprehended in Springfield, Massachusetts on July 17, 2006, when officers there spotted a vehicle matching the description that had been broadcasted by the Rochester police. When the Springfield officers drove by the vehicle, Petitioner "quickly turned away from" the officers and pulled in front of an auto-detailing shop. Petitioner jumped out of the car and ran into the shop. After obtaining the owner's permission to search the building, the officers found Petitioner inside one of the vehicles with the seat reclined all the way back. Petitioner gave his name as Mitchell Lazu and a false date of birth. When he was brought to the police station, Petitioner admitted his identity and gave his actual birthdate.

Petitioner did not testify, and the defense called no witnesses.

On April 26, 2007, the jury returned a verdict finding Petitioner not guilty of felony murder, but guilty of intentional murder. The jury also convicted him of the three counts involving weapons-possession. T.676-80. On June 8, 2007, Judge Keenan sentenced Petitioner to a concurrent sentences, the longest of

-7-

which was an indeterminate term of 25 years to life on the murder conviction.

Petitioner filed a counseled brief appealing his conviction. On November 16, 2012, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction. People v. Velazquez, 100 A.D.3d 1504 (4th Dep't 2012). On January 29, 2013, the New York Court of Appeals denied Petitioner's leave application. People v. Velazquez, 20 N.Y.3d 1015 (2013).

In papers dated March 4, 2013, Petitioner filed a pro se motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 in Monroe County Court (DeMarco, J.). The motion was denied the motion on April 8, 2013, for the reasons stated in the prosecution's answering affirmation. The Appellate Division denied leave to appeal on July 8, 2013.

This timely habeas petition followed, in which Petitioner asserts the following grounds for relief: (1) the trial court erred in submitting a written copy of a portion of the jury charge to the jurors; (2) the evidence of intentional murder was legally insufficient; (3) the verdicts on the intentional murder and second-degree weapons possession counts were against the weight of the credible evidence; (4) the sentence was harsh and excessive because the trial court relied on incorrect information; (5) the prosecutor failed to disclose evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963); and (6) trial counsel was ineffective

-8-

for failing to investigate the alleged <u>Brady</u> evidence and failing to retain a forensic expert to testify regarding this evidence.

Respondent answered the petition, asserting the defenses of non-exhaustion and procedural default with regard to the jury charge and weight of the evidence claims. Respondent alternatively argues that these claims are not cognizable on habeas review and are without merit. Respondent concedes that Petitioner's legal sufficiency, excessive sentence, <u>Brady</u>, and ineffective assistance claims are exhausted, but argues that they are meritless. Petitioner did not file a reply brief.

For the reasons set forth below, the petition is dismissed.

**III. Discussion**

**A.  Error in Submitting Part of the Jury Instructions in Writing to Jurors**

Near the beginning of deliberations, the jury sent out a note which requested "the description of each count and the law that applies to that count." T.660. The trial judge noted, "It seems to me that if the request is for a read back it would be for the entire charge, not just the elements." <u>Id.</u> The prosecutor was not opposed to the jury having the charge in writing if they wanted it. Defense counsel said that he would consent to "the two murder and the three weapons [charges]" but "[n]othing else though." T.661.

The trial judge then informed the jury that he could submit the written instructions to the jury, since counsel had "consented to my charges on the five indicted counts being submitted to you in

written fashion"; in the alternative, the judge said he could verbally re-instruct the jury as to those charges. T.661-62. The jury foreperson said that the jury would prefer the written charge. T.661-62.

Outside of the jury's presence, the trial judge provided counsel with copies of the "substantive charge on the five indicted counts," the language of which was "the exact charge" that the judge had shown to counsel prior to summations. T.662. After reviewing the language, defense counsel requested redaction of the words "previous conviction" in a heading regarding one of the weapons counts, and the prosecutor consented to that redaction. T.662-63. The trial judge noted that the heading, which appeared in the "OCA [Office of Court Administration] template," had not been read to the jury when it was charged initially. T.663. Neither counsel had any other redaction requests. T.664.

Petitioner contended on appeal that the trial court erred in providing a written copy of the pattern jury instructions relating to the charges because doing so was not based on a specific jury request as contemplated by C.P.L. § 310.30.[4] The Appellate Division held that the claim was unpreserved, and disagreed that the court committed a "mode of proceedings error" such that preservation was

---

[4] This statutory section provides in pertinent part that "[w]ith the consent of the parties and upon the request of the jury for further instruction with respect to a statute, the court may also give to the jury copies of the text of any statute which, in its discretion, the court deems proper." N.Y. CRIM. PROC. LAW § 310.30.

not required. Velazquez, 100 A.D.3d at 1505 (citations omitted). The Appellate Division concluded that, in any event, the trial court had properly responded to the jury's request. Id. (citations omitted).

Petitioner's habeas claim regarding the alleged error in responding to the jury's request is premised solely on C.P.L. § 310.30. Because it is based on a provision of state statutory law, it does not present a question of federal constitutional magnitude amenable to habeas revew. See, e.g., Serrano v. Kirkpatrick, No. 11-cv-2825, 2013 WL 3226849, at *11 (S.D.N.Y. June 25, 2013) ("[T]o the extent that Petitioner also argues that the trial court erred by failing to comply with N.Y. CRIM. PROC. LAW § 310.30, that argument must be denied. A claim premised on a violation of [§ 310.30] does not allege a violation of a federally protected right,' as required by AEDPA.") (quoting Cornado v. Bellnier, No. 10 Civ. 5265(RA)(HBP) 2012 WL 6644637, at *5 (S.D.N.Y. Sept. 20, 2012), report and recommendation adopted by 2012 WL 6681692 (S.D.N.Y. Dec. 21, 2012); footnote omitted). Accordingly, the jury response claim cannot provide a basis for habeas relief and is dismissed as non-cognizable.

**B.   Legal Insufficiency of the Evidence**

Petitioner asserts, as he did on direct appeal, that there was insufficient evidence that he committed intentional murder, either as a principal or an accomplice. The Appellate Division rejected

Petitioner's legal insufficiency claim on the merits. Velazquez, 100 A.D.3d at 1505 (citations omitted). As discussed further below, the Court finds that the Appellate Division did not incorrectly apply federal law.

In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court held that a habeas court reviewing the legal sufficiency of the evidence supporting a state conviction must look to state law for "the substantive elements of the criminal offense[,]" id. at 324 n.16, and then consider the trial proof in the light most favorable to the prosecution. Id. at 319. The habeas court must uphold the conviction if "any rational trier of fact[, viewing the evidence in the light most favorable to the prosecution,] could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). "[T]he standard enunciated in Jackson remains a difficult one for petitioners to meet." Gruttola v. Hammock, 639 F.2d 922, 927 (2d Cir. 1981).

Under P.L. § 125.25(1), a defendant is guilty of second degree (intentional) murder when, acting with the intent to cause the death of another person, he does so. N.Y. PENAL LAW § 125.25(1). A defendant acts intentionally with respect to a result "when his conscious objective is to cause such result[.]" N.Y. PENAL LAW § 15.05(1)). Petitioner was charged as an accessory under P.L. § 20.00, which provides that "[w]hen one person engages in conduct which constitutes an offense, another person is criminally liable

for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aides such person to engage in such conduct." N.Y. Penal Law § 20.00.

The Appellate Division found that there was "a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt[,]" Velazquez, 100 A.D.3d at 1505 (quotation and citation omitted), given that "[a] witness [i.e., Torres] who knew [Petitioner] testified that she saw him standing over the bleeding victim, gun in hand, almost immediately after the shots were fired. When that witness told [Petitioner] that she was going to call the police, [Petitioner] pointed the gun at her before he fled." Velazquez, 100 A.D.3d at 1506. The Appellate Division further found that "the fact that the victim was shot in the head, neck and chest, and that several shots were fired from close range, established the intent to kill element" of second-degree murder. Id. See also, e.g., People v. Gonzales, 1 N.Y.3d 464, 467 (2004) (finding that "defendant was guilty of an intentional shooting or no other" where defendant "shot the victim once in the chest, once in the face from 6 to 18 inches away, six times in the back of the head from approximately six inches away, and twice in the back"). The Appellate Division considered Petitioner's "subsequent flight" out of state as further evidence of his consciousness of guilt. Id.

(citation omitted).

Petitioner notes that although Torres testified that she saw him holding a handgun at the moment she discovered Ortiz in the stairwell, there was no proof that the gun Petitioner possessed was loaded, had been discharged, or otherwise contributed to Ortiz's death. Petitioner points out that neither Torres nor any other witness saw Petitioner take any action in furtherance of intentional murder. With respect to the identity of Torres' killer, it is important to note that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) (citations omitted). New York courts have consistently held that even in the absence of an eyewitness who actually sees who killed the victim, circumstantial evidence establishing the killer's identity can constitute legally sufficient evidence. See, e.g., People v. Cantres, 238 A.D.2d 56, 59-60 (1st Dep't 1997) ("given the close proximity of the elevator to the front stairwell and the marked direction of defendant's movement toward the front stairwell, there was a reasonable view of the evidence from which the jury could infer that defendant entered the front stairwell[,]" and "[c]onsidering the brief period between defendant's entry into the stairwell and the absence of evidence that anyone else was in the stairwell with the decedent at the time of the shooting, there was also a reasonable view of the evidence from which to infer that

defendant was the perpetrator"); People v. Ruiz, 211 A.D.2d 829, 830 (2d Dep't 1995); People v. Martinez, 197 A.D.2d 539, 540 (2d Dep't 1994).

Here, although no one actually watched as Ortiz was shot multiple times, the jury was entitled to draw reasonable inferences from the circumstantial evidence, which included the following: At least two guns were fired during the murder, and no gun was recovered at the scene. Petitioner was seen by Torres holding a handgun, and thus there was proof that he possessed at least one firearm. When Torres told him she was going to call the police, Petitioner briefly trained his gun on her before leaving the stairwell with a black bag and her car keys. She then saw Petitioner get into the passenger-side of a van and be driven away from the crime scene. Viewing this evidence in the light most favorable to the prosecution, there clearly was a valid line of permissible inferences leading to a rational conclusion that Petitioner was guilty, at least as an accomplice, of intentionally causing Torres' death by shooting him multiple times at close range. See, e.g., People v. Ruiz, 211 A.D.2d at 830 (two eyewitnesses testified they heard gunshots being fired on the street and saw the defendant jogging away from the location where the victim was found; one of these witnesses saw the defendant holding a semi-automatic handgun; "[t]his evidence was legally sufficient to permit the inference that the defendant fired the

shots, and his intent to cause death is manifest by his act of repeatedly shooting the victim") (citations omitted).

### C.    Sentence Based on Misinformation

Petitioner argues that his sentence is excessive, because the trial court relied on purported misinformation in the pre-sentence report ("PSR"). Petitioner renews his appellate argument that these supposedly erroneous statements influenced the trial court's sentencing decision, and that the trial court failed to weigh petitioner's status as a father and his absence of any violent convictions. The Appellate Division summarily rejected this claim on the merits. Velazquez, 100 A.D.3d at 1506.

"Misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process.'" United States v. Malcolm, 432 F.2d 809, 816 (2d Cir. 1970) (citing Townsend v. Burke, 334 U.S. 736, 740-41 (1948)). Although an error in the PSR may require resentencing, the error must amount to "misinformation of a constitutional magnitude[,]" United States v. Tucker, 404 U.S. 443, 447 (1972), meaning that the sentence "might have been different if the sentencing judge had known [the correct information." Id. at 448 (footnote omitted).

Petitioner asserts that Judge Keenan based the sentence on certain statements in the PSR that Petitioner had shot Ortiz

"multiple" times, and that "[b]ased on the record of phone calls back and forth, the victim was set up for something to happen, or his death was the result of a 'drug deal gone bad.'" Respondent's Memorandum of Law ("Resp't Mem.") at 31 (quoting PSR).[5] The Court does not find that there was anything misleading or incorrect about the foregoing statements. The medical evidence clearly established that Ortiz had been shot at close range at least five times. By its guilty verdict, the jury found that the prosecutor had proven, beyond a reasonable doubt, that Petitioner was accessorially liable for intentional murder. New York law does not assign different levels of culpability to principals and accessories. See, e.g., People v. Duncan, 46 N.Y.2d 74, 79-80 (1978) ("There is no distinction between liability as a principal and criminal culpability as an accessory and the status for which the defendant is convicted has no bearing upon the theory of the prosecution.") (citations omitted).

The Court turns next to the statement in the PSR speculating that "[b]ased on the record of phone calls", Ortiz "was set up for something". Resp't Mem. at 31 (quoting PSR). Petitioner argued on appeal that this statement was not based on any evidence offered at trial. Although the jury did hear testimony from Torres that Ortiz had received a call on his cell phone just before he opened the

---

[5]

    Respondent did not file the PSR, as it is confidential. It will not be necessary for Respondent to forward a copy of the PSR to the Court for in camera review.

back door, Petitioner is correct that there was no evidence adduced at trial regarding a "series of calls". However, this claim of prejudice is based purely on speculation, for in his next sentence Petitioner admits that the reference to the calls "*possibly influenc[ed]*" the court's sentencing. If the misinformation had no effect on the sentence, then there is no basis for resentencing. See Castillo v. Donelly, No. 06-cv-3388, 2007 WL 1395463, at *6 (E.D.N.Y. May 7, 2007) (although PSR contained an inaccuracy as to which crime petitioner pleaded guilty to and the judge misspoke when he repeated that mistake, these errors had no impact on the sentence actually imposed); Ramos v. Superintendent, Sing Sing Corr. Facility, No. 11-cv-4929, 2014 WL 243148, at *7 (S.D.N.Y. Jan. 22, 2014) (claim that court "'likely took' the allegedly false information into account at sentencing, because the information was contained in the presentence report" had no basis where the sentencing court did not refer to the information and relied instead on the circumstances of the crime and the petitioner's criminal history).

Finally, Petitioner's assertion that the trial court abused its discretion in sentencing, by not adequately taking into account his positive characteristics, does not present a federal constitutional claim. The top count on which Petitioner was convicted, second-degree murder, is a class A-I felony under New York law. N.Y. PENAL LAW § 125.25. The statutory sentencing range for

a class A-I felony is an indeterminate term having a minimum length of 15 to 25 years and a maximum of life in prison. See id., §§ 70.00(2)(a), 70.00(3)(a)(i). Although Petitioner was sentenced to the maximum possible, his sentence still was within the applicable statutory range, and the trial court did not act outside of the discretion afforded to it. E.g., Ferguson v. Walker, No. 00Civ.1356(LTS)(AJP), 2002 WL 31246533, at *10 (S.D.N.Y. Oct. 7, 2002).

### D.   Verdicts Against the Weight of the Evidence

Petitioner's claim that the verdicts finding him guilty of intentional murder and second-degree weapons possession were against the weight of the credible evidence are not cognizable on federal habeas review. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (stating that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal;" deferring to the jury's assessments of the particular weight to be accorded to the evidence and the credibility of witnesses); People v. Bleakley, 69 N.Y.2d 490, 495 (1987) (explaining that a "weight of the evidence" argument is a pure state law claim grounded in C.P.L. § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence") (quotation omitted).

### E. __Brady__ Violation

Petitioner reasserts his contention, raised in his C.P.L. § 440.10 motion, that the prosecutor failed to disclose that the police recovered the victim's gray sweater and his broken pair of eyeglasses, which he had been wearing at the time of the shooting. According to Petitioner, this amounted to a violation of the prosecutor's due process obligations under __Brady__. The C.P.L. § 440.10 court summarily rejected this claim for the reasons stated in the prosecutor's opposing affirmation, i.e., that there was no suppression of the items, because defense counsel was apprised of their existence during the exchange of discovery, and, in any event, the items did not constitute __Brady__ material.

A true __Brady__ claim has three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." __Strickler v. Greene__, 527 U.S. 263, 281-82 (1999). "[T]he government does not bear the burden of establishing that documents were not withheld; it is [Petitioner]'s burden to prove that the government failed to disclose evidence favorable to [Petitioner]." __Harris v. United States__, 9 F. Supp.2d 246, 275 (S.D.N.Y. 1998) (citing __United States v. Payne__, 63 F.3d 1200, 1208 (2d Cir. 1995)). Moreover, "evidence is not considered to have been suppressed within the meaning of the

Brady doctrine if the defendant or his attorney '"either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence."'" Payne, 63 F.3d at 1208 (quotations omitted).

Here, as the prosecutor noted in his response to the C.P.L. § 440.10 motion, Petitioner's own supporting exhibits indicated that both the gray sweater and the pair of glasses were listed on the property custody report provided to defense counsel during discovery. Also, the prosecutor's letter dated August 28, 2006, informed defense counsel that "[t]he property described in the property custody reports is available for the defense to view[.]" Petitioner's Exhibits B & D to C.P.L. § 440.10 Motion; see SR-308 to SR-309; SR-206 to SR-208). The prosecutor cannot be said to have "suppressed" any potential Brady material, since she disclosed the existence of the sweater and glasses, well before trial, and offered to make them available for defense counsel's inspection. Petitioner's Brady claim therefore fails as a matter of law.

## F.   Ineffective Assistance of Trial Counsel

Petitioner claims, as he did in support of his C.P.L. § 440.10 motion, that trial counsel was ineffective for allegedly not inspecting alleged Brady material (i.e., the sweater and the glasses) and for not hiring an expert to conduct forensic testing on these items. The C.P.L. § 440.10 court summarily rejected this claim.

Under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), to prevail on a claim of ineffective assistance of counsel, a petitioner must establish two components. The first is deficient performance—that counsel's performance "fell below an objective standard of reasonableness." <u>Id.</u> at 688, 694. Prejudice is the second half of an ineffective assistance claim, and it is shown when there "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

In his C.P.L. § 440.10 motion, Petitioner argued that "[d]efense [c]ounsel did not check the glasses for any blood, DNA, skin etc.,due to the fact that someone elses [sic] fist could have broken those glasses . . . ." SR-292. With regard to the glasses, Petitioner contends that if they bore traces of DNA from a third party (i.e., someone other than Petitioner or Ortiz), defense counsel could have argued that Ortiz physically fought with someone other than Petitioner. Even if the glasses did contain DNA material from someone other than Petitioner and Ortiz, such evidence would not have been of material, exculpatory value given that the police recovered ballistics material suggesting at least two firearms were used in the shooting, and that Petitioner was indicted as an accessory. In other words, the presence of another shooter already was contemplated by the prosecution and DNA material from a third party on Ortiz's glasses would not have excluded Petitioner as a

principal shooter, or an accessory to person who did the shooting. There is no reasonable probability of a different result, and Petitioner therefore cannot demonstrate prejudice.

Turning next to the sweater, Petitioner states in his C.P.L. § 440.10 motion that counsel erroneously failed to "secure" the sweater "for personal testing and rebuttal evidence through testimony and concerning an Intent Element of Murder, Bullet holes, Burns on Sweater Material, etc. . . . ." Id. It is not entirely clear what Petitioner believes forensic testing of the sweater would have revealed. As noted above, the firearms expert testified that the sweater had a hole in the chest area that appeared to have been made by a "contact" gunshot. T.460-61. Petitioner may have believed that defense counsel should have obtained an expert witness who would have opined that the hole in the sweater was *not* caused by a "contact" gunshot. Assuming arguendo that such an expert was available to testify to that effect, it would not have had any appreciable effect on the verdict because there was other, additional evidence that Ortiz was shot at close range. In particular, the coroner concluded that, based on the soot and stippling on Ortiz's face, at least two bullets (Bullets A and B) were fired from "a couple of feet" away from Ortiz's cheek and ear. T.530-10, 513-17. Thus, as Respondent notes, the close-range nature of the shooting was established by Bullets A and B (neither of which penetrated the sweater). The firearms expert's testimony that

-23-

Bullet C made a "contact" hole in the chest area of the sweater was not necessary for the prosecution to establish that Ortiz was shot twice in the head at close range. In other words, even if an expert could have testified that the hole in the sweater was not caused by a contact gunshot, there is no reasonable probability that such evidence would have affected the verdict, much less created a reasonable doubt where none existed, given the uncontroverted evidence that Ortiz sustained two close-range, fatal gunshots to the head. In sum, Petitioner's complaints about trial counsel's performance are based on pure speculation and are without merit.

## IV. Conclusion

For the reasons discussed above, the petition (Dkt. #1) is dismissed. As Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability will issue. See 28 U.S.C. § 2253(c)(2). Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

**SO ORDERED.**

S/ Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          March 11, 2015

-24-